Argued June 23, reversed July 6, 1926.

## ADELA VNUK v. FRED V. PATTERSON.

(247 Pac. 766.)

**Breach of Marriage Promise.**

1. A promise to marry, made to knowledge of both parties within less than two months after divorce, or prior thereto, is not enforceable, in view of Section 515, Or. L.

**Breach of Marriage Promise.**

2. To render promise to marry valid, both parties must be eligible to enter contract at time.

---

1. Validity of promise to marry during period wherein remarriage prohibited, see note in **L. R. A.** 1918B, 70. See, also, 4 **R. C. L.** 145.

**Dismissal and Nonsuit.**

3. Where illegality of contract appears from complaint, action for breach thereof will be dismissed at any stage of proceedings, though illegality is not pleaded as defense, and may have been expressly waived.

Appeal and Error, 4 C. J., p. 1164, n. 27, 43.
Breach of Marriage Promise, 9 C. J., p. 324, n. 28, 29, p. 325, n. 31.
Contracts, 13 C. J., p. 426, n. 38, p. 464, n. 74, p. 493, n. 18.

From Multnomah: GEORGE ROSSMAN, Judge.

Department 1.

REVERSED.

For appellant there was a brief over the names of *Messrs. Lonergan & Wagner* and *Mr. Robert N. Munly,* with an oral argument by *Mr. Wm. A. Munly.*

For respondent there was a brief and oral argument by *Mr. Arthur I. Moulton.*

BURNETT, J.—The plaintiff, aged twenty-eight years, seeks to recover damages from the defendant, who is thirty-nine years of age, for an alleged breach of a mutual promise to marry each other. So far as disclosed by the record, the case is not in any sense or element one of seduction. In substance, the complaint is that during April, 1921, in Nebraska, the defendant, in consideration that plaintiff consented and agreed to marry him, promised and agreed to marry plaintiff within a reasonable time, not less than six months thereafter, which promise the plaintiff accepted, each of them being then and there single and of legal age. She further avers that in reliance on the promise of the defendant and in preparation

3. See 6 R. C. L. 818.

to perform the agreement, she left Nebraska and came to Portland, Oregon, and has since remained there; that the defendant continued the agreement·up to December, 1922, when without cause he broke the contract and informed the plaintiff that he would not marry her. She says she has been damaged in a sum mentioned and demands judgment.

The defendant traverses all the allegations of the complaint. In addition to the denials of the answer, the defendant avers, in substance, that he was married to another woman about November 30, 1909, which marriage continued until March 7, 1921, when a decree of absolute divorce dissolving said marriage was granted by the Circuit Court of the State of Oregon for Clatsop County, and that prior to the entry of the divorce decree dissolving the marriage between the defendant and his former wife, he and that wife being separated, the plaintiff and defendant in the present action agreed that in the event a divorce was obtained by said defendant's former wife, the present plaintiff and defendant would intermarry at such a time as might be suitable to both parties after the time during which the remarriage of said defendant was prohibited by law should elapse. This allegation is admitted by the reply, coupled with the further averment:

"That subsequent to the entry of said decree, in said paragraph mentioned, and at the time mentioned in plaintiff's complaint herein, said plaintiff and defendant mutually contracted and agreed that they would intermarry each to the other, as in plaintiff's complaint herein set forth."

The answer charges that the plaintiff, shortly after her arrival in Portland, and on January 28, 1923, herself abjured the engagement to marry and that

the defendant has never renewed the same since her termination thereof. After the testimony was all in and the court had instructed the jury, the defendant moved the court for a directed verdict for the defendant on the ground that there was no evidence to support the complaint. This motion was denied and .constitutes the principal ground of error relied upon by the defendant to reverse the judgment rendered against him on the verdict of the jury and from which he appealed.

Without question the decree of divorce was pronounced March 7, 1921, dissolving the marriage between the defendant and his former wife. Beyond calling a witness to identify a letter and some holiday cards, the only witness for the plaintiff was herself. Asked to tell the jury when she and the defendant first talked about marrying, she said:

"A. Well, it was when he was married, along in 1915 or '16, that was the first time.

"Q. What was the conversation then?

"A. It is so long ago I don't remember what it was, but after he got his divorce he asked me about going to another place; he said he would get a new location.

"Q. What did he say about you and he marrying when he got a new location?

"A. He said we would be married and break away; we wouldn't be married in my home town.

"Q. Did you agree to that?

"A. Yes.

"Q. What time of the year was that conversation when that agreement was definitely made?

"A. April, 1921, just before he went to Portland."

On cross-examination she testified that when she began keeping company with the defendant in 1915, she knew that he was married and not divorced, and

that she was engaged to marry him before the divorce was obtained, while he yet lived in Nebraska. The following also appears in her testimony:

"Q. When was this promise you claim Dr. Patterson made to you; when was that; can you fix the time?

"A. That was made just before he left Nebraska.

"Q. Was that the first time he had proposed to you?

"A. No; he did before.

"Q. When was the first time?

"A. While he was married, in 1915 or '16.

"Q. Do you remember the date?

"A. No, I do not.

"Q. You had never been proposed to before had you, by anyone?

"A. No, sir.

"Q. You were a single girl?

"A. Yes, sir. * *

"Q. When was there any other proposal made to you?

"A. Just before he left Nebraska, when he was thinking about making a change. * * He said he was single, he showed me his divorce papers; he said 'Will you go with me?' I says, 'You know the folks are living here, I can't do that, and besides we couldn't get married for six months.' * *

"Q. Were those the only two proposals he made, one in 1915 or '16, and just before he left Nebraska?

"A. Yes.

"Q. There were no other proposals during the time from 1915 to 1921?

"A. Time and time again when he was married he said if his wife didn't get a divorce he would and we would be married; he told me that time and time again."

1. It is settled by numerous authorities, and many precedents say there is no question about it, that where one of the parties to a mutual promise to

marry is at that time the spouse of another living person and that fact is known to the other party, it is void as against public policy. This public policy as to promise to marry, when it is known to both that one of the parties has an undivorced spouse then living, is part of the common law and does not depend upon any legislative enactment. We have, however, a statute in Oregon, Section 515, Or. L., reading thus:

"A decree declaring a marriage void or dissolved at the suit or claim of either party shall have the effect to terminate such marriage as to both parties, except that neither party shall be capable of contracting marriage with a third person, and if he or she does so contract, shall be liable therefor as if said decree had not been given, until the suit has been heard and determined on appeal; but in no case until the expiration of six months from the date of said decree; * * ."

This legislation establishes the public policy of this state. The plaintiff is here asking the court to enforce a contract made, if at all, within less than two months after the granting of the divorce between the defendant and his former wife, whereas the law says neither of them was then capable of contracting marriage with a third party.

In *Noice* v. *Brown,* 38 N. J. L. 228 (20 Am. Rep. 388), the defendant, being a married man, and living apart from his wife, and in expectation of a divorce from her in a suit then pending, promised the plaintiff in that case to marry her in a reasonable time after such divorce should have been obtained, Mr. Chief Justice BEASLEY said:

"I cannot see the faintest semblance of legality in the promise here laid. It is wholly fallacious to sup-

pose that a contract is not illegitimate if the act agreed to be done would not be illegal at the time of its contemplated performance. Such is not the law. A contract is totally void, if, when it is made, it is opposed to morality or public policy.''

On appeal to the Court of Errors and Appeals, 39 N. J. L. 133 (23 Am. Rep. 213), the judgment was affirmed and the court, speaking by Chancellor Runyon, said:

'' * * It is obvious that the cases cited on the argument in support of the declaration, in which the action was upon a promise to marry, made by a man who, though married at the time, was not known to the promisee to be so, differ radically from that under consideration. Here was no deceit, but the plaintiff was fully apprised of the fact that the defendant was married, and the fulfillment of his promise was expressly dependent upon the result of a pending suit for divorce brought by his wife against him. Such a promise, made under such circumstances, is, for the reasons given in the opinion of the Supreme Court, clearly against public policy, and no action can, therefore, be maintained upon it.''

In *Johnson* v. *Iss*, 114 Tenn. 114 (85 S. W. 79, 108 Am. St. Rep. 891), it was held that where a married woman whose husband had disappeared and who, by virtue of statutory provision, had the right to marry again after five years, if such husband should not be known to be living, engaged herself to marry four and a half years after the disappearance of the husband, such contract was against public policy; that she could maintain no action for its breach and that its illegality was not cured by the fact that the marriage was not to take place until after the five years prescribed by statute had expired, or until she could obtain a divorce.

*Paddock* v. *Robinson,* 63 Ill. 99 (14 Am. Rep. 112), was an action for a breach of promise of marriage. On the trial, the court, against the objection of defendant, permitted the plaintiff to prove promises of marriage made at a time when both parties were married and known to be so by each other. LAWRENCE, Chief Justice, said:

" * * such a contract should certainly not be recognized as valid in a court of justice."

The plaintiff had cited Chitty on Contracts, where it was said that the promise of a married man to marry within a reasonable time is not void, although he was married at the time of making such promise, because his wife might have died within such reasonable time. The court said, however:

"But on examining the authorities on which the text is based, and which are cited by the author, * * we find, in both cases, the plaintiff was not aware that the defendant had a wife living at the time of making the promise. * * We fully concur in these decisions. The plaintiff was an innocent party. She did not know she was listening to immoral professions or accepting a promise which the promisor had no right to make. * * In the case before us, neither party was innocent. Both knew their contract of marriage was essentially immoral."

In *Gulick* v. *Gulick,* 41 N. J. L. 13, although the statute had declared void certain marriages where certain physical characteristics were present, the plaintiff sued the defendant for breach of promise to marry. In declaring the principle, the court held thus:

" * * The defendant could not bind himself to enter into a marriage which, by force of its own inherent conditions, might be declared by the Chancel-

lor to be void *ab initio.* Having made such a promise, he had a *locus penitentiae,* and could repudiate it without subjecting himself to a liability to be sued. The plaintiff should have been nonsuited at the trial, and on this account the rule must be made absolute.''

In *Haviland* v. *Halstead,* 34 N. Y. 643, according to the syllabus, it was held:

"An action for the breach of a contract of marriage, between parties in this state, cannot be maintained where one of the parties was, by law, incapable of entering into the marriage relation at the time of making the contract.''

There, as here, the arrangement was that the woman in the case was to go to New Jersey where they would be married, but the court said:

" * * Even if it should be conceded that, if the parties had proceeded to the State of New Jersey and there been married, that such marriage would have been lawful and binding, yet, as already observed, it is quite another question whether an action can be maintained in the courts of this state for damages upon a breach of a contract made here, and in contemplation of the parties, at the time it was made, to be performed here, and which, by the laws of this state, is prohibited and declared to be void. I think clearly not, and that the plaintiff should have been nonsuited upon the trial.''

The opinion was rendered by Chief Justice DAVIES. In his concurring opinion, Mr. Justice SMITH, after discussing the reason for some exceptions in favor of marriages contracted in other states which would be void in the state of the forum, said:

"No such considerations of public policy arises in the case of an unconsummated promise of marriage. If made by a person who is within the prohibition of our statute, it is simply an unlawful contract, which the courts of this state will not enforce, and for the breach of which they will not award damages.''

There are a few cases holding that a promise to marry lawfully may be made after a decree divorcing one or both of the parties from a former spouse while yet the decree has not reached the stage of ultimate finality, provided it is agreed that the marriage shall not actually be solemnized until after that finality is attained. Such cases are *Buelna* v. *Ryan,* 139 Cal. 630 (73 Pac. 466); *Harpold* v. *Doyle,* 16 Idaho, 671 (102 Pac. 158); *Cooper* v. *Bower,* 78 Kan. 156 (96 Pac. 59). In all of them the statute upon which they are based merely forbids marriage within a certain period after the divorce decree. It says nothing against an agreement for future wedlock and does not declare as our law does, "that neither party shall be capable of contracting marriage with a third person." Our statute is more drastic in its restriction and makes the divorced party incapable of contracting marriage within the stated period.

2. The results and reason of the preponderating weight of decision are that in order for a promise to marry to be valid, the parties must both be at the time eligible to enter into such a contract. The reason is found in public policy to preserve marriages and to prevent them from being entered into lightly or unadvisedly, and it matters not whether the public policy is of the common law or of the statute.

In *McLennan* v. *McLennan,* 31 Or. 480 (50 Pac. 802, 65 Am. St. Rep. 835, 38 L. R. A. 863), it was held, in construing our statute already quoted, that it applies to the innocent as well as to the guilty and goes to the capacity of either party to remarry within the prescribed time and, therefore, the cases cited and the doctrine contended for have no application to the question in hand, the contention there

being on the part of those who contracted a marriage in Washington, within six months after a divorce in Oregon, that a marriage valid where solemnized is valid everywhere. The court concluded its opinion, speaking by Mr. Justice Robert S. Bean, as follows:

" * * We are clear, therefore, that plaintiff's marriage, having been contracted before the expiration of the time allowed by law in which to appeal from a decree of divorce, is absolutely void, and the decree of the court below must be reversed, and it is so ordered."

The same doctrine is announced in *Hooper* v. *Hooper,* 67 Or. 187 (135 Pac. 525). These cases have never been overturned or doubted.

3. The plaintiff has come into the courts of Oregon seeking to enforce a contract which she says was made, giving to her testimony the utmost effect, at a time when, in the words of our statute, the defendant was not capable of contracting marriage with her. Not being capable at the time the alleged contract was entered into, the stipulation is void as against the public policy enunciated in the statute. What, then, is our duty under the authorities holding that a nonsuit should have been granted and under the decisions of our own courts?

In *Jackson* v. *Baker,* 48 Or. 155 (85 Pac. 512), the familiar rule often quoted was laid down in the opinion by Mr. Chief Justice Bean:

"If the illegality appears from the complaint or the plaintiff's case, the court will, at any stage of the proceedings, dismiss the action, although such illegality is not pleaded as a defense, or insisted upon by the parties, and may have been expressly waived by them. It is an objection which the court itself is bound to raise in the due administration of justice,

regardless of the wishes of the parties.'' Citing many precedents.

The same doctrine is laid down in *Mitchell* v. *Coach,* 83 Or. 45 (153 Pac. 478, 162 Pac. 1058); *Rosenkrantz* v. *Barde,* 107 Or. 338 (214 Pac. 893); *Newport Construction Co.* v. *Porter, ante,* p. 127 (246 Pac. 211).

The plaintiff in this suit does not pretend innocence or ignorance of the marital state of the defendant. She had associated with him for several years, knowing all the while that he was the lawful husband of another woman. If we take as proven that the defendant, after the divorce was granted, made another promise to marry the plaintiff, yet it was made at a time when by the express language of our statute he was incapable of making such a contract. Under the public policy of this state, it is our duty, in upholding its laws, to refuse to enforce such an arrangement at the suit of one who was fully aware of all the ingredients of the situation.

The judgment of the Circuit Court is reversed, with directions to enter a judgment for the defendant.

                    REVERSED WITH DIRECTIONS.

McBRIDE, C. J., and RAND and COSHOW, JJ., concur.